No. 99,468

In the Matter of STEVEN A. JENSEN, *Respondent*.

(191 P.3d 1118)

Opinion filed September 12, 2008.

*Alexander M. Walczak*, deputy disciplinary administrator, argued the cause and was on the brief for the petitioner.

*John J. Ambrosio*, of Ambrosio & Ambrosio, Chtd., of Topeka, was on the brief and argued the cause for respondent, and *Kathleen Ambrosio*, of same firm, was with him on the brief, and *Steven A. Jensen*, respondent, argued the cause pro se.

*Per Curiam*: This is an original contested proceeding in discipline filed by the office of the Disciplinary Administrator against Steven A. Jensen. Jensen was admitted to practice law in Kansas on October 5, 1988.

The office of the Disciplinary Administrator filed a formal complaint against Jensen based upon two complaints which it had received. The complainant in Case No. DA9818 was Sheila Schultz, an attorney who had been opposing counsel in a contested post-divorce child custody action. The formal complaint alleged violations of Kansas Rules of Professional Conduct (KRPC) 3.4(c) (2007 Kan. Ct. R. Annot. 514) (fairness to opposing party and counsel); 8.3(a) and (b) (2007 Kan. Ct. R. Annot. 558) (reporting professional misconduct); and 8.4(a), (c), and (d) (2007 Kan. Ct. R. Annot. 559) (misconduct).

The complaint which was docketed as Case No. DA10,098 was filed by Jennifer Duncan who was the opposing party in the child custody case. Duncan reported that Jensen had led her husband's work supervisor to believe that Jensen was the Duncans' attorney. As a result, Jensen obtained private information about Mr. Duncan's job and income. Jensen also reportedly told the supervisor that, despite having been subpoenaed by Jennifer Duncan's attorney, the supervisor did not have to appear in court unless Jensen contacted him again. The formal complaint alleged violations of KRPC 3.4(a) and (c); 4.1(a) (2007 Kan. Ct. R. Annot. 527) (truth-

fulness in statements to others); 4.3 (2007 Kan. Ct. R. Annot. 532) (dealing with unrepresented persons); 4.4 (2007 Kan. Ct. R. Annot. 532) (respect for rights of third persons); 8.3(a) and (b); and 8.4(a), (c), and (d).

Jensen answered, denying any and all alleged violations of the KRPC. A hearing was held on September 18, 2007.

On DA9818, the Schultz complaint, the hearing panel found no disciplinary violations, dismissing the alleged violations of KRPC 3.4(c) and 8.4(a), (c), and (d) and concluding that clear and convincing evidence had not established that Jensen had violated KRPC 8.3(a) and (b).

With respect to DA10,098, the Duncan complaint, the hearing panel concluded that Jensen had not violated KRPC 3.4(c), 4.4, or 8.3(a) and (b). However, a majority of the hearing panel found that Jensen violated KRPC 3.4(a), 4.1(a), 4.3, and 8.4(a), (c), and (d).

The factual dispute before this court involves a telephone conversation between Jensen and Mr. Duncan's supervisor, Alden Jenkins. Both Jensen and the supervisor testified before the hearing panel and presented differing versions of the precise conversation. However, we do know that Jensen did not identify himself as the attorney representing the party opposing the Duncans in the child custody dispute; that Jenkins believed that he was talking to the Duncans' attorney; and that both Jensen and Jenkins knew that the Duncans' attorney had subpoenaed Jenkins to testify at the child custody hearing.

After the evidentiary hearing, a majority of the hearing panel made the following findings of fact and conclusions of law:

### "FINDINGS OF FACT"

"The Hearing Panel finds the following facts, by clear and convincing evidence:

"1. Steven A. Jensen (hereinafter 'the Respondent') is an attorney at law, Kansas Attorney Registration No. 13713. His last registration address with the Clerk of the Appellate Courts of Kansas is . . . Paola, Kansas 66071 . . . . The Respondent was admitted to the practice of law in the State of Kansas on October 5, 1988.

"2. During their marriage, Steve Anderson and Jennifer Duncan had three children. In 2002, Mr. Anderson and Mrs. Duncan divorced. The divorce action was filed in the District Court of Linn County, Kansas, and captioned *In the Matter of the Marriage of Anderson,* case number 02DM28.

"3. Following the divorce, Mrs. Duncan married Rich Duncan. Mr. Duncan is employed by BNSF Railway. In late 2005 or early 2006, BNSF Railway offered Mr. Duncan a promotion. Acceptance of the promotion would require that the Duncans move to Lincoln, Nebraska.

"4. After Mr. Duncan accepted the promotion, Mr. Anderson retained the Respondent to file a motion to change residential custody. Mrs. Duncan retained Sheila Schultz[1] to represent her in regard to the motion filed. The Honorable Richard M. Smith presided over the case.

"5. Prior to the hearing on the motion, Ms. Schultz issued a subpoena to Alden Jenkins, Mr. Duncan's supervisor at BNSF Railway. Additionally, Mr. or Mrs. Duncan informed Mr. Jenkins that their attorney would be calling him prior to the hearing. They did not inform him of the name or gender of their attorney.

"6. After the subpoena was delivered to Mr. Jenkins at a satellite office and before Mr. Jenkins [had] opened it, on January 9, 2006, the Respondent placed a telephone call to Mr. Jenkins and left a recorded telephone message in Mr. Jenkins' phone mail. In the message, the Respondent identified himself as an attorney in the case involving Rich and Jennifer Duncan, but did not identify his client. The Respondent also stated in the message that he would like to speak with Mr. Duncan [sic] and ask him some questions regarding a transfer in the railroad industry because there were several things that he was certain he did not understand.

"7. On January 18, 2006, Mr. Jenkins returned the Respondent's call, and throughout the conversation, Mr. Jenkins believed that the Respondent represented Rich and Jennifer Duncan. Again, the Respondent failed to identify himself as the attorney for Mr. Anderson. The Respondent testified that he did not identify himself as counsel for Mr. Anderson because he is male and Ms. Shultz is female. He elaborated that Mr. Jenkins had already received the subpoena, which indicated that Ms. Shultz is the attorney for the Duncans. During the conversation, which lasted nine minutes, the Respondent asked whether Mr. Jenkins received the subpoena. Mr. Jenkins confirmed that he had and the Respondent said, 'good.' The Respondent went on to chat about the railroad industry and ask questions about Mr. Duncan's employment succession plan for BNSF Railway. Because the Respondent seemed to know detailed information regarding Mr. Duncan, including information regarding his job, his promotion, and the fact that Mr. Jenkins was his supervisor and because the Respondent referred to Mr. Duncan, as 'Rich,' Mr. Jenkins believed that the Respondent obtained his information directly from Rich. Because he believed that the Respondent was representing Mr. and Mrs. Duncan, Mr. Jenkins opened up with additional information regarding Mr. Duncan's current earnings and his potential for future earnings as he progressed to different management levels within the company. According to the Respondent,

---

[1] Ms. Schultz serves as the Municipal Judge for Paola, Kansas. Previously, the Respondent served in that capacity.

Mr. Jenkins made arguments trying to convince the Respondent that the move would be a good thing for the family.

"8. At the end of the conversation, the Respondent told Mr. Jenkins that he would contact him later and let him know if Mr. Jenkins' testimony would be required. Despite the subpoena issued and served by Ms. Schultz on Mr. Jenkins, the Respondent told Mr. Jenkins that he did not need to appear at the scheduled hearing unless he heard from the Respondent.[2]

"9. At the conclusion of the hearing, Judge Smith lectured the parties to be good parents. During his lecture, Judge Smith directed the parties to submit to a written parenting test by answering two questions, unassisted by the attorneys. The two questions were: In the event the Court rules that the children are allowed to move to Nebraska with Mrs. Duncan, what will you tell the children and how will you tell them? And, in the event the Court rules that the children are not allowed to move to Nebraska with Mrs. Duncan, what will you tell the children and how will you tell them? Judge Smith directed the attorneys to refrain from assisting their clients.

"10. During Judge Smith's lecture, the Respondent wrote down the questions at the top of the paper and, additionally, the Respondent made other notes in the lower left hand side of the paper. Specifically, the Respondent wrote, 'it's about the kids' and made marks around the words. The Respondent also wrote the word, 'together' and underlined it twice. Finally, the Respondent wrote the word, 'Expand' and underlined it. The Respondent is left-handed, and at the time the Respondent made the notes on the left hand side of the paper, Mr. Anderson was sitting on the Respondent's left.

"11. Ms. Schultz testified that she noticed that the Respondent was making notes, that the Respondent pushed the piece of paper toward his client, and that the Respondent repeatedly tapped his piece of paper to draw his client's attention to the notes he made. As a result, Ms. Schultz got up from her seat and walked behind the Respondent. The Respondent positioned his body in an attempt to hide his notes from Ms. Schultz.

"12. The Respondent testified that he did show his client his notes of the questions the judge asked, because the client told him he had missed the last part of the second question. The Respondent testified that he later jotted the notes at the bottom of the paper and never showed them to his client. Mr. Anderson corroborated this in his testimony. The Respondent testified that he did not re-

---

[2] The Respondent testified regarding his telephone conversation with Mr. Jenkins. The Respondent testified that he 'would not' have said that to Mr. Jenkins. A majority of the Hearing Panel finds that the Respondent's testimony lacks credibility in this regard. Mr. Jenkins' testimony and his letter of March 8, 2006, found at Disciplinary Administrator's Exhibit 8, pp. 71-72, provide a clear picture of the telephone conversation. Mr. Jenkins' testimony was clear and convincing to a majority of the Hearing Panel.

peatedly tap his paper, that he did not hide his notes from Ms. Shultz, but rather that he was pulling up his sock or tying his shoe while she stood behind him.

"13. The courtroom contains two video cameras, positioned in different locations in the courtroom. The hearing was video taped. The Hearing Panel reviewed the recording of the proceedings three times. The recording includes recordings from both cameras with different views. The recording is not a high quality recording.

"14. Based upon the viewing of the video tape recording, the Hearing Panel was unable to confirm key facts from Mrs. Schultz and from the Respondent. It was not clear from the record that the Respondent repeatedly tapped his piece of paper. Additionally, it was not clear from the recording when, specifically, the Respondent made the three notes in question. Finally, it was not clear from the recording what was written on the Respondent's paper at the time he showed it to his client.

"15. From a careful review of the recording, however, it is clear from the recording that the Respondent was not pulling up his sock or tying his shoe.[3]

"16. Following his instructions to Mr. Anderson and Mrs. Duncan, Judge Smith left the courtroom. Ms. Schultz confronted the Respondent about whether he violated the Court's order to refrain from assisting his client with answering the questions. Ms. Schultz asked the bailiff to inform the Court that she believed that the Respondent had violated the Court's order. Judge Smith returned to the courtroom, questioned the Respondent regarding his behavior, and chastised him for violating the Court's order. Judge Smith concluded that the Respondent's response that he had not improperly attempted to assist his client with the two questions was less than truthful. In Judge Smith's opinion, the Respondent is in the upper end of the category of aggressive attorneys whom the judge deals with in the local bar.

"17. On February 3, 2006, Ms. Schultz filed a complaint with the Disciplinary Administrator's office regarding the Respondent. Thereafter, on February 23, 2006, the Respondent filed his written response to the complaint. In his response, the Respondent lodged harsh allegations against Ms. Schultz. Specifically, the Respondent alleged that Ms. Schultz violated the judicial canons in her service as the Paola, Kansas, municipal court judge.

"18. The Disciplinary Administrator wrote to the Respondent and informed him of his obligation to report Ms. Schultz to the Commission of Judicial Qualifications. The Respondent did not file a complaint against Ms. Schultz with the Commission of Judicial Qualifications.

---

[3] While it is not material whether the Respondent was pulling up his sock or tying his shoe, it bothered a majority of the Hearing Panel that the Respondent would testify to that when it clearly did not occur. Shielding notes from opposing counsel is not problematic. Testifying in a manner inconsistent with the truth, however, is a problem.

"19. On June 9, 2006, Mrs. Duncan filed a complaint against the Respondent regarding the Respondent's contact with Mr. Jenkins. Thereafter, the Respondent filed a response to the complaint. The Respondent's vitriolic response can be found at Disciplinary Administrator's Exhibit 9.

## "CONCLUSIONS OF LAW

"1. In the Formal Complaint, the Disciplinary Administrator included allegations that [Respondent] violated the Kansas Rules of Professional Conduct based upon Ms. Schultz' complaint as well as Mrs. Duncan's complaint.

"2. With regard to Ms. Schultz' complaint, the Disciplinary Administrator alleged that the Respondent violated KRPC 3.4(c), KRPC 8.4(a), KRPC 8.4(c), and KRPC 8.4(d), by attempting to assist Mr. Anderson in answering the two written questions. A majority of the Hearing Panel concludes that it is more likely than not that the Respondent violated those rules. However, because the burden of proof is clear and convincing evidence, the Hearing Panel, accordingly, dismisses the allegations that the Respondent violated KRPC 3.4(c), KRPC 8.4(a), KRPC 8.4(c), and KRPC 8.4(d) with regard to Ms. Schultz' complaint.

"3. Additionally, with regard to Ms. Schultz' complaint, the Disciplinary Administrator alleged that the Respondent violated KRPC 8.3(a) for failing to self-report his own misconduct and KRPC 8.4(b) for failing to report what he believed to be misconduct by Ms. Schultz in her capacity as a municipal court judge. The Hearing Panel unanimously concludes that the Respondent did not violate KRPC 8.3(a) for failing to report himself. KRPC 8.3(a) requires that an attorney report misconduct when he has 'knowledge of any action, inaction, or conduct which in his or her opinion constitutes misconduct of an attorney.' In this case, the Respondent believed, and continues to believe, that he did not engage in misconduct. As a result, no obligation to report flows from KRPC 8.3(a).

"4. KRPC 8.3(b) requires that an attorney report the misconduct of a judge when the attorney has 'knowledge that a judge has committed a violation . . . that raises a substantial question to the judge's fitness.' In this case, the Respondent made serious allegations against Ms. Schultz both personally and in her capacity as a municipal court judge. However, the allegations made regarding Ms. Schultz were general in nature. The Respondent provided no specific evidence that would lead one to conclude that Ms. Schultz violated the judicial canons. Thus, when reviewing the Respondent's letter as a whole, a majority of the Hearing Panel concludes that the Respondent was merely lashing out against Ms. Schultz because she filed a complaint against him. The Respondent's letter was unprofessional and ill advised, however, it does not create an obligation for the Respondent to file a complaint against Ms. Schultz pursuant to KRPC 8.3(b).

"5. With regard to Mrs. Duncan's complaint, the Disciplinary Administrator alleged that the Respondent violated KRPC 3.4(a) [and (c)], KRPC 4.1(a), KRPC 4.3, KRPC 4.4, [KRPC 8.3(a) and (b),] KRPC 8.4(a), KRPC 8.4(c), and KRPC 8.4(d). A majority of the Hearing Panel concludes that clear and convincing evidence was presented that establishes that the Respondent violated KRPC 3.4(a),

KRPC 4.1(a), KRPC 4.3, KRPC 8.4(a), KRPC 8.4(c), and KRPC 8.4(d). The Hearing Panel unanimously concludes that the Respondent did not violate KRPC 4.4.

"6. KRPC 4.4 provides:

'In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.'

The Respondent's conduct with regard to Mr. Jenkins does not amount to a method of obtaining evidence that violated Mr. Jenkins' legal rights. Accordingly, the allegation that the Respondent violated KRPC 4.4 is dismissed.

"7. Lawyers are required to be fair to the opposing party and counsel. *See* KRPC 3.4. Specifically,

'A lawyer shall not:

(a) unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act;' KRPC 3.4(a).

KRPC 8.4(a) provides that it is professional misconduct for a lawyer to violate **or attempt** to violate the rules of professional conduct. In this case, the Respondent violated KRPC 3.4(a) and KRPC 8.4(a), when he attempted to obstruct Ms. Schultz' access to Mr. Jenkins. The Respondent told Mr. Jenkins that he did not need to appear in Court unless the Respondent contacted him for a second time. At the time the Respondent made this statement, Mr. Jenkins was under subpoena to appear in Court, pursuant to a subpoena issued by Ms. Schultz. As a result, a majority of the Hearing Panel concludes that the Respondent violated KRPC 3.4(a) and KRPC 8.4(a).

"8. KRPC 4.1(a) provides that '[i]n the course of representing a client a lawyer shall not knowingly make a false statement of material fact or law to a third person.' The Respondent violated KRPC 4.1(a) when he knowingly instructed Mr. Jenkins that he need not appear at the motion hearing unless the Respondent contacted him again. As such, the Hearing Panel concludes that the Respondent violated KRPC 4.1(a).

"9. Lawyers must take special care in dealing with persons who are not repre-sented by counsel. KRPC 4.3 provides the requirement [in] this regard:

'In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.'

The Respondent either knew or reasonably should have known that Mr. Jenkins misunderstood the Respondent's role in the post-divorce child custody matter. The Respondent introduced himself to Mr. Jenkins as an attorney in the case involving Rich and Jennifer Duncan. The Respondent never explained that he was the attorney for Mr. Anderson. He testified that his reason for not doing so

was that Mr. Jenkins had received the subpoena issued by Ms. Shultz and Mr. Jenkins knew that the Respondent was not Ms. Shultz or representing anyone in Ms. Shultz' office. Nevertheless, Mr. Jenkins formed the belief that the Respondent represented Rich and Jennifer Duncan and a majority of the Hearing Panel finds this belief reasonable. The Respondent had referred to himself as an attorney in the case involving Rich and Jennifer Duncan, not the case involving Mr. Anderson; asked if Mr. Jenkins had received the subpoena, which Mr. Jenkins knew was being sent by the attorney for Rich and Jennifer Duncan; called Mr. Duncan by his first name; and knew detailed information regarding Mr. Duncan. The Respondent knew or should have known of Mr. Jenkins' misunderstanding, particularly after Mr. Jenkins presented information which the Respondent did not request and made arguments about the benefits to the children from the move. After the misunderstanding occurred, the Respondent did nothing to correct the misunderstanding. Thus, because the Respondent should have known of Mr. Jenkins' misunderstanding and because the Respondent did not correct the misunderstanding, the Hearing Panel concludes that the Respondent violated KRPC 4.3.

"10. 'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The Respondent misrepresented the truth when he instructed Mr. Jenkins that he need not appear in court unless he heard from the Respondent. As such, the Hearing Panel concludes that the Respondent violated KRPC 8.4(c).

"11. 'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d). In this case, the Respondent engaged in 'conduct that is prejudicial to the administration of justice' when he instructed Mr. Jenkins that he need not appear in court unless he heard from the Respondent. Therefore, the Hearing Panel concludes that the Respondent violated KRPC 8.4(d)."

One of the panel members filed a separate, dissenting opinion, which stated:

## "DISSENTING OPINION

"1. I disagree with the two hearing panel members who determined there was clear and convincing evidence of all but one of the alleged violations in Count Two against Respondent.

"2. A self regulated profession such as the legal profession must seriously consider complaints of improper conduct against its members and impose appropriate sanctions when misconduct is proved by the evidence. At the same time, lawyers' livelihoods generally depend upon their licenses to practice law and their professional reputations. Loss of either must not be imposed without clear standards of misconduct and proper evidence of violation of those standards. The Kansas Supreme Court in Rule 211(f) requires that the evidence of wrongdoing in attorney

disciplinary matters be clear and convincing, more than a mere preponderance of the evidence.

"3. The Official Comment to the Pattern Instructions for Kansas 3d Civil, 102.11 states that clear and convincing evidence 'should be "clear" in the sense that it is certain, plain to understand, unambiguous, and "convincing" in the sense that it is so reasonable and persuasive as to cause you to believe it.' In *In re Shirk's Estate*, 194 Kan. 424, 430, 399 P.2d 850, 856 (1965), the Supreme Court cited with approval a Fifth Circuit Court of Appeals definition of clear and convincing evidence: '[t]he witnesses to a fact must be found to be credible and that the facts to which they have testified are distinctly remembered and the details thereof narrated exactly and in due order and that the testimony be clear, direct and weighty and convincing, so as to enable you to come to a clear conviction without hesitancy of the truth of the precise facts in issue.' The evidence is this case did not reach that standard of proof.

"4. The complaint in Count Two was filed by an adversarial party in a contested child custody matter, involving her primary witness, Alden Jenkins. The only evidence of the content of the telephone conversation between Mr. Jenkins and the Respondent was from the two of them. The Disciplinary Administrator's Office has repeatedly made public statements that the frequent animosity in domestic relations cases leads to a disproportionate number of complaints being filed against lawyers in such cases either by unhappy clients or unhappy adverse parties, and that these complaints must be viewed with the understanding that the underlying animosity may taint the recollections of witnesses.

"5. It was alleged that Respondent violated Rule 4.3, which has two parts. First, it requires that in dealing with a person not represented by counsel, 'a lawyer shall not state or imply that the lawyer is disinterested.' There was no evidence presented that Respondent violated this prohibition. Mr. Jenkins testified that Respondent left a voice mail message, giving his name and stating that he was [the/an] attorney in the case of Rich and Jennifer Duncan. The exact article used was not clear from the evidence, but it was clear that Respondent stated his interest in the case and left his name and number, asking for a return call. Although the best practice for a lawyer speaking to an unrepresented third party is to begin the conversation by clearly stating whom the lawyer represents, that is not required by Rule 4.3. Respondent did what is required by Rule 4.3, and thus did not violate the first part of the Rule.

"6. The second part of Rule 4.3 provides that '[w]hen a lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.' At the hearing, no evidence was presented to attempt to prove that the Respondent knew or reasonably should have known that Mr. Jenkins misunderstood whom he represented.

"7. The evidence was uncontroverted that when Mr. Jenkins returned the Respondent's telephone call, Mr. Jenkins believed he was calling the attorney for Jennifer Duncan. He testified that he 'inferred' he was speaking with her attorney.

Respondent does not claim that he clearly stated to Mr. Jenkins that he represented Steve Anderson, although he believed that Mr. Jenkins knew he represented Mr. Anderson, for three reasons.

"8. Sheila Schultz, the attorney for Ms. Duncan, had served Mr. Jenkins with a subpoena nine days before the telephone conversation between Mr. Jenkins and the Respondent. The subpoena was a one page document, with three lines at the top commanding Mr. Jenkins to appear as a witness on behalf of Ms. Duncan. Prominently on the page was the name of Ms. Schultz as the attorney issuing the subpoena. Mr. Jenkins testified that early in the conversation Respondent asked him if he had received the subpoena and that he said he had. From that answer, a reasonable person would have thought that Mr. Jenkins knew that Ms. Duncan was represented by Ms. Schultz.

"9. Respondent testified that at one point in the conversation he told Mr. Jenkins that Mr. Anderson had given him information about Mr. Duncan's job transfer. Respondent was speaking on the assumption that Mr. Jenkins understood his role and appeared to have no indication that he did not.

"10. In another part of the conversation, when Mr. Jenkins stated that Ms. Duncan's current husband would be making $150,000 a year and thus the children would not want for anything, Respondent replied that the children might want for their father, thus indicating his advocacy for Mr. Anderson and his belief that Mr. Jenkins understood that he represented Mr. Anderson.

"11. Most importantly, there was no evidence that Mr. Jenkins said anything in the conversation that should have alerted the Respondent to his misunderstanding. Although there was a misunderstanding on the part of Mr. Jenkins, the evidence was that Respondent did not and should not have had reason to know such a misunderstanding had occurred. Thus, I conclude that although it was unfortunate that Mr. Jenkins misunderstood that Respondent represented Mr. Anderson, there was no evidence of violation of Rule 4.3.

"12. Count Two also alleged violations of Rules 3.4(a) and 4.1, based upon Mr. Jenkins' testimony that Respondent told him he would let him know if his testimony would be required and that he did not need to appear unless he heard from Respondent. If Respondent made such a statement, it would be attempting unlawfully to obstruct another person's access to evidence and making a false statement of law to a third person. Respondent adamantly denied making such a statement. Thus the issue was whether the evidence that the statement was made was clear and convincing. I believe it was not.

"13. First, Mr. Jenkins was not familiar with the legal process and testified that he might have misconstrued what the Respondent said. Because he apparently believed that Respondent had issued the subpoena to him, he was more likely to have misunderstood what was said about it. Mr. Jenkins' testimony on this issue was not clear and convincing, *i.e.*, it was not 'distinctly remembered,' 'enabling one to come to a clear conviction without hesitancy of the truth of the precise facts in issue.'

"14. Second, the Respondent's testimony that he did not make such a statement is highly credible. He is a lawyer with a clear duty to be honest in his statements to others. He is familiar with the legal process and knew such a statement would be absolutely incorrect and unethical. If he were to have caused Mr. Jenkins not to appear, he would have expected Ms. Schultz to have taken prompt action for sanctions. Respondent also testified that he wanted Mr. Jenkins to appear as a witness because he thought some of his testimony would be helpful to his client. Respondent has no previous disciplinary violations and evidence was submitted from 14 attorneys who have practiced against him for many years and five other persons who have worked with Respondent professionally that he is honest and practices law with integrity. It would have been out of character, highly risky, and self defeating for him to make such a statement.

"15. Respondent suggested in his letter responding to this complaint that if anything, he might have made a statement that he would not be issuing a subpoena. That is a more likely explanation of what was said and misunderstood by the witness. There was not clear and convincing evidence that Respondent made the statement alleged. His professional reputation and his license to practice should not be jeopardized on the basis of a likely misunderstanding by a witness for an adverse party.

"16. If it is concluded that Respondent did not tell Mr. Jenkins not to appear on the subpoena that had been served, then all of the alleged violations in Count Two fail."

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of Kansas Rules of Professional Conduct exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by substantial, clear, convincing, and satisfactory evidence. *In re Comfort*, 284 Kan. 183, 190, 159 P.3d 1011 (2007); *In re Landrith*, 280 Kan. 619, 636, 124 P.3d 467 (2005); see also Supreme Court Rule 211(f) (2007 Kan. Ct. R. Annot. 304) (misconduct to be established by clear and convincing evidence).

"This court views the findings of fact, conclusions of law, and recommendations made by the disciplinary panel as advisory, but gives the final hearing report the same dignity as a special verdict by a jury or the findings of a trial court. Thus, the disciplinary panel's report will be adopted where amply sustained by the evidence, but not where it is against the clear weight of the evidence. [Citations omitted.]" *In re Lober*, 276 Kan. 633, 636-37, 78 P.3d 442 (2003).

As the dissent noted, the clear and convincing burden of proof plays a critical role in analyzing the evidence in this case. At the

time, the hearing panel did not have the benefit of our recent discussion of the clear and convincing evidence standard in *In re B.D.-Y.*, 286 Kan. 686, 187 P.3d 594 (2008). There, we clarified that "clear and convincing evidence" is an intermediate standard of proof which lies between the preponderance of the evidence burden of proof and that burden which requires proof beyond a reasonable doubt. 286 Kan. 686, Syl. ¶ 2. The touchstone of the clear and convincing standard is that the evidence must establish that the truth of the facts asserted is "highly probable." 286 Kan. 686, Syl. ¶ 3.

### *Respondent's statement about court appearance*

Applying that standard, we first turn to the finding that Jensen violated various rules by telling Jenkins that his testimony might not be required and that Jensen would contact Jenkins if he needed to appear in court. Jensen denies having said that and, as the dissent pointed out, offered the possible explanation that he may have told Jenkins that Jensen would not be issuing a subpoena.

Obviously, a determination of what Jensen said to Jenkins involves assessing credibility which is best done by observing the witnesses. The majority of the panel found Jenkins' testimony to be credible. The dissent found that the evidence was not clear and convincing for two reasons.

First, the dissent believes that because Jenkins was not familiar with the legal process and mistakenly believed he was talking to the attorney who issued the subpoena, Jenkins "was more likely to have misunderstood what was said about it." The dissent opined that Jenkins' testimony was not clear and convincing, in part because it was not "distinctly remembered." The record does not support that conclusion.

Jenkins' testimony at the disciplinary hearing was not equivocal. We are not persuaded that his response of "It's possible" to the question of whether he might have misconstrued Jensen's statement manifests a lapse in memory. The response came during a contentious portion of the hearing during which Jensen's attorney was re-cross-examining Jenkins. In a March 8, 2006, letter to the district judge who presided at the custody hearing, Jenkins detailed

the January 18, 2006, conversation that he had with Jensen, specifically stating that "[i]n closing the conversation, Mr. Jensen told me that he would contact me later and let me know if my testimony would be required and that I did not need to appear unless I heard from him." Jenkins' disciplinary hearing testimony was consistent with the statement he wrote less than 2 months after the conversation.

Further, it is difficult to connect how Jenkins' legal naivete or misidentification of the caller would make it more likely that he would misunderstand what he was being told about physically appearing in court. One would not need a law degree to understand an attorney's statement that it might be unnecessary to go to court and testify. Further, Jenkins' belief that the caller was the attorney who caused the subpoena to issue would simply mean that there would be no need for Jenkins to question the caller's authority to rescind the subpoena's directive.

Second, the dissent found Jensen's testimony to be highly credible because "[i]t would have been out of character, highly risky, and self defeating for him to make such a statement." The basis for that finding is the dissenter's belief that Jensen, as a lawyer, would have known better than to make such a statement; that Jensen would have known he would get caught if Jenkins failed to appear at the hearing; and that Jensen had no motive to make the statement because he wanted Jenkins to testify at the hearing. We do not find that the dissent's theories counteract the evidence in the record.

If one looks at motive, an important consideration is that Jenkins was a disinterested, non-party witness without any personal stake in the litigation, *i.e.*, he had no apparent motive to fabricate the statement about his appearance in court. Moreover, one would expect a person in Jenkins' circumstance to be attuned to any statements that an attorney might relate concerning whether the subpoenaed witness had to expend his time and effort to appear and testify at a court hearing in which he was not personally involved.

On the other hand, Jensen's protestations that he had no motive to make the statement because he wanted Jenkins to testify are less convincing in light of the trial judge's disciplinary hearing tes-

timony. The judge opined that Jenkins' testimony was very helpful to Mrs. Duncan and harmful to Anderson's theory of the case.

In conclusion, we find that the evidence in this case was sufficient to establish that it was highly probable that Jensen made the statement to Jenkins about appearing in court on the subpoena. Further, that evidence supports the panel's findings of KRPC violations.

### Witness misunderstanding

In contrast, we are persuaded by the dissent's analysis of the alleged violation of KRPC 4.3. The first part of that rule prohibits an attorney, who is dealing with an unrepresented person on behalf of the attorney's client, from stating or implying that the attorney is disinterested. Jenkins testified that Jensen did not state who he was representing. While Jensen may have been too clever by half in his interview techniques, we cannot say from the record that it is highly probable that Jensen intentionally implied that he was disinterested.

What is crystal clear from the evidence is that Jenkins misunderstood the role that Jensen was performing in the custody dispute. However, the interviewee's misunderstanding is not controlling. The second part of KRPC 4.3 directs that an attorney who "knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter" is to "make reasonable efforts to correct the misunderstanding." 2007 Kan. Ct. R. Annot. 532. The question, then, is whether Jensen should have known that Jenkins misunderstood Jensen's role.

In his letter to the trial judge, Jenkins acknowledged that he would have freely assisted Anderson's attorney with understanding everything concerning succession planning and transfers in the railroad industry. However, he said he felt humiliated and angry that he had been so forthcoming with other information, such as Mr. Duncan's salary, which he would not have shared if he had known with whom he was speaking. In other words, the contention is that Jensen should have known about the misunderstanding because of the scope of the information that Jenkins provided. However, we

are unconvinced that the misunderstanding was readily apparent from the content of Jenkins' side of the conversation.

Moreover, there were other portions of the conversation which might well have provided Jenkins with a clue as to Jensen's role. When Jenkins said the children would want for nothing while residing with the Duncans because of Mr. Duncan's salary, Jensen responded that they would want for their father, at least suggesting an advocacy of the father's position. Given our clear and convincing standard, we cannot find that the evidence established that it was highly probable that Jensen should have known of Jenkins' confusion. Accordingly, we find that Jensen did not violate KRPC 4.3.

*SANCTION*

The majority of the hearing panel recommended published censure and costs to be assessed against Jensen. Their recommendation is based on the following analysis:

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated.* The Respondent violated his duty to the legal system to treat individuals fairly.

"*Mental State.* The Respondent knowingly violated his duty.

"*Injury.* As a result of the Respondent's misconduct, the Respondent caused potential harm to the administration of justice.

"*Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factor present:

"Substantial Experience in the Practice of Law. The Kansas Supreme Court admitted the Respondent to practice law in 1988. At the time the Respondent engaged in misconduct, the Respondent had been practicing law for a period exceeding 17 years. Accordingly, the Hearing Panel concludes that the Respondent had substantial experience in the practice of law at the time he engaged in the misconduct.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"Absence of a Prior Disciplinary Record. The Respondent has not previously been disciplined.

"Previous Good Character and Reputation in the Community Including any Letters from Clients, Friends, and Lawyers in Support of the Character and General Reputation of the Attorney. The Respondent is an active and productive member of the bar in Paola, Kansas. He enjoys the respect of his peers and clients and generally possesses a good character and reputation as evidenced by several letters received by the Hearing Panel.

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

'Suspension is generally appropriate when a lawyer engages in communication with an individual in the legal system when the lawyer knows that such communication is improper, and causes injury or potential injury to a party or causes interference or potential interference with the outcome of the legal proceeding.' Standard 6.32.

'Reprimand is generally appropriate when a lawyer is negligent in determining whether it is proper to engage in communication with an individual in the legal system, and causes injury or potential injury to a party or interference or potential interference with the outcome of the legal proceeding.' Standard 6.33."

We adopt the hearing panel's findings of fact and conclusions of law, except as to KRPC 4.3, that respondent violated KRPC 3.4(a), 4.1(a), and 8.4(a), (c), and (d). The court accepts the recommendation of a majority of the hearing panel to impose the sanction of published censure.

IT IS THEREFORE ORDERED that respondent, Steven A. Jensen, be and he is hereby disciplined by published censure in accordance with Supreme Court Rule 203(a)(3) (2007 Kan. Ct. R. Ann. 261) for violations of KRPC 3.4(a), 4.1(a), and 8.4(a), (c), and (d).

IT IS FURTHER ORDERED that this opinion be published in the official Kansas Reports and that the costs of these proceedings be assessed against the respondent.